Our fifth case for this morning is United States v. Larry Pust. Mr. Morris. May it please the Court, Daniel Morris, Leslie Berry, and Chris Woods for Appellant Larry Pust. This challenge to the sufficiency of the evidence turns on whether the government proved that one of the investors in what turned out to be a Ponzi scheme had an intent to defraud based on e-mails the government selected and based on the government's ipsy-dixit of what those e-mails meant. The e-mails themselves aren't incriminating. It is only the government's conjectural overlay that lends them any criminal meaning. But the e-mails were not the only evidence in this case, hence your second issue as a matter of fact. There's testimony from Mr. Anderson and one can look at the e-mails in the broader context to suggest that Mr. Pust is misrepresenting to investors how their money is going to be used and otherwise in on the scheme. Well, a point of clarification, the only testimony from Mr. Anderson would have came from the e-mails. He didn't actually testify at trial. There is no evidence that any of what turned out to be misrepresentations that Larry Pust made about the program that he didn't himself believe those representations to be true. There's ample evidence that he participated in what he perceived as a legitimate business enterprise. But no evidence that he wasn't just duped by Bob Anderson like so many others. The problem with that, at least in this document, about half of the e-mails include communications from Mr. Pust to Mr. Anderson. And, you know, he's so like Anderson with this amazing e-mail address, creatingincomeatcomcast.net. But they're exchanging these comments about, you know, who are you going to pay? I can't wait until we get rid of them. We're down to our last dollar. I mean, maybe a jury could have seen it your way, but it seems to me a jury could have seen it the government's way as well. The jury could have made the reasonable inference that Pust knew that the REI program was having a cash crunch or that he didn't like some of his clients. But to go from that reasonable inference to the further inference that the entire regime was a Ponzi scheme is not a reasonable inference. There you're piling inference upon inference. And the e-mails consistently talk about, hey, we need to get our returns back to our clients. We need to make sure that we're getting these people paid. I've mentioned in the brief that I think roughly half of the e-mails, in fact, speak not at all about REI and seem to have nothing to do with the REI program. Even there, they're talking about the need to return to their clients those returns, and then after that overhead they're allowed to take profit. That's Exhibit 119, which I think is A1002. What's interesting about that exhibit is it also is not consistent with a Ponzi scheme theory at all. These are, yes, exotic traits. You keep using the term Ponzi scheme. I think that they're consistent with the notion that there is this fanciful, huge return on investment, low-income housing program, but that's not what this money is being used for, even though the investors think it's being used for that. It's being used for these other trading programs, which are mentioned frequently in the e-mails. Except that the government's evidence was that Larry Pust spoke to REI, the Ponzi scheme investors, about these other programs, about the European trading things, about the Dr. Fred trade, and that at least two of the seven victim investors who testified at the trial of this matter actually took up that opportunity, invested in some of these other activities. That's inconsistent with doing this on the slide. These were fully disclosed programs made available to REI investors. And even as the program disintegrated, and clearly Larry Pust was on notice that there was a crash crunch, we see Larry Pust communicating, disclosing that to the investors as well. In Exhibit 162, which is at A1032, in response to a question from an investor, Larry is not only relaying the excuses that he's heard from Bob Anderson, his sole source of information about this, because after all, Larry Pust was in Washington State, not Chicago. Larry Pust had no control.  I mean, it's e-mails, it's all online stuff. I'm not sure whether it's location matters. Only to the extent that the government claims to have expected to see e-mails from Larry about selecting contractors and Section 8 qualification in every aspect. But where are the e-mails about anything to do with real estate? Pust is recruiting investors for the scheme. There's no evidence that Larry's role, that Larry ever represented his role as being active in the communication. The evidence of the trial witness... What do you think his role was? What do you think the facts compel a jury to find? That Larry Pust talked to people about what he thought was a great investment, and that he, in fact, had great experiences with, and that the people that he introduced to that program had a great experience with. But that there was no evidence... But you notice they're shuffling the money all over the place. I mean, there's no new money coming into this other than from the investors. But that's what we see in hindsight, not what Larry Pust saw at the time. Bob Anderson had control of the accounts. He got blind copied on occasional e-mails to the law firm that maintained the escrow accounts with amounts of shits going out. I'm sorry? Escrow accounts. Escrow accounts, yes. There's one account, and then there's a successor account. There are, in fact, two accounts. Right. One and then a successor. Oh, I'm sorry. What Larry's understanding at the time was is that there were at least two escrow accounts, and even of the one account, it was maintained as part of the attorney's larger account with special restrictions on the subdivision of it. So Larry's ability to perceive that this was a Ponzi scheme was limited to the representations of Bob Anderson, a person whose ability was to deceive. I mean, we had two separate groups of investors who traveled from Arizona to Chicago for the express purpose of seeing the homes that were being built, did not see a single home, but managed to leave feeling satisfied and prepared to invest more money in this program. Under these circumstances, it is not a reasonable inference to base intent to defraud, proof of intent to defraud, on 25 e-mails selected out of 7,500, most of which are elliptical, most of which, if anything, evince Larry Pust's consistent concern with getting these people paid. The case is not unlike McCrimmon, a case like we cited in our opening brief out of the 11th Circuit. The similarities are there. Which upholds the conviction, as I recall. Yes, which is striking because it's the distinguishing factors between that case and this case which are the grounds for the 11th Circuit upholding the conviction there. Unlike McCrimmon, Larry Pust was not an experienced, sophisticated broker. Unlike McCrimmon, Larry Pust gave no indication of an awareness of the criminality of the scheme by warning people off. Didn't Pust tell investors that their funds would remain in the escrow account? That was Larry Pust's understanding, absolutely. And it was very clear with some of the e-mails that went back and forth that that's not where the money remained. It was very clear that at least for the other programs, there were different rules. The government's theory depends on an identity that all investor money was the REI program money. Larry Pust knew that not to be true because Larry Pust had recruited for other programs that weren't the REI program that didn't have the same restrictions. To try to accredit him with knowledge that we have after the fact is not a reasonable inference of his intent at the time. That same argument was made to the jury, the same one you're making to us. The same portions of the same argument was made to the jury. And the jury didn't buy it. But the issue is it never should have went to the jury. While I'm here to answer your questions, I notice that I'm now in my rebuttal. Yeah, if you'd like to save a minute, that would be fine. Thank you. Mr. Harjani. Good morning, Your Honors. May it please the Court, Sunil Harjani for the United States. Your Honors, the defendant Larry Pust and his co-defendant ran a $10 million investment scheme promising investors their funds would go into low-income housing developments. So what are your smoking gun emails here, Mr. Harjani? What would you isolate out of all of these? Some of them are just kind of chatty things. Your Honor, I would point you to three emails in particular. Exhibit 126, which was an email between Larry Pust and Anderson dated March 3, 2007. Exhibit 126, what does that map to in pages? It looks like it's page 1,009, Your Honor. 1,009 in this. And the date? The date of the email is March 30, 2007, Your Honor. That is an email chain between Larry Pust and Robert Anderson. In that chain, Larry Pust in the second half talks about how money is owed to investors, low-income housing investors, namely Kevin Oakeson, an investor who testified at the trial, Robert Ginsberg, and David Bond, another investors that were identified in Summary Chart 1, a list of investors we submitted at trial. And Larry Pust talks about how these people are owed 10% per month on their investment. In response, Robert Anderson, all he talks about is that money is coming in from Dr. Fred and from Methwall, the training programs, how they need to make investors current, how they need to move money back to the escrow. As one of Your Honors pointed out, the money should never have left the escrow because it was supposed to remain there according to the representations Larry Pust made to investors. But they talk about moving money back to the escrow. They're talking about how they're running behind in some of these monies, and then they talk about a nightmare it's been for the two of them, that a simple scenario, which would be using investor money for trading, has turned into a nightmare. And Robert Anderson tells Larry Pust that he needs to raise more money to keep this thing going. There is no discussion of low-income housing or contractors or building inner-city lots or obtaining government bond financing or Section 8 housing. None of that is discussed. All that's discussed is training, Methwall, Dr. Fred, and what a disaster this has been in not being able to replenish the escrow account. Exhibit 147, Your Honor, is another smoking gun you know. April 20- And that's on page- What date? Page 1019. Page 1019, Your Honors, dated April 30, 2008. That is an email communication between Robert Anderson and Larry Pust. In the second half of the email, Robert Anderson tells Larry Pust, I just got $175,000 from an investor, Brett Cleese, again another low-income housing investor identified in the government's charts introduced at trial. And in response, Larry Pust says, let's use that money to make interest payments to other investors, namely Betty Warner, Gene Foster, Mr. Wilcox, Mr. Dobson, all low-income housing investors identified at trial. And talks about using one investor money to make essentially Ponzi payments back to another investor. Does that tell us that he knows that that's not kosher? Yes, Your Honor, because the promises made, Mr. Pust's promises made to investors were that their money would go into low-income housing development, the financing of low-income housing development, and it would not leave the escrow account. Right here, Brett Cleese is being defrauded. And how did you prove that that's the promise he made to them from the investor testimony? Yes, we had seven investors testify at trial along with all their emails and agreements introduced. And the promises were their money would go to finance low-income housing. It would stay in the escrow account. They get 10% to 20% a month, unconditionally guaranteed, and that these housing developments are backed by government bonds and Section 8 housing. All of that is false, and all of that is not disputed in this appeal. So you're saying these emails have to be read against the backdrop of that direct investor testimony? Absolutely, Your Honor, because the emails have direct linkages to what the investor testimony was. And then at some point, didn't Pust edit a letter concerning to the investors about the reason for the problem with the non-return that it had something to do with the mortgage crisis? Right, that's correct, Your Honor. And that the closings would also take place? Yes, absolutely. Those drafts are in the—what you're referring to, Your Honors, is Anderson and Pust go over a draft letter to investors talking about mortgage crisis, back up in getting financing, and that same letter goes to the investors. And that is after all of these emails talking about how the money from trading is being lost, it's not successful, and how they are running out of funds in the escrow account. So that is right there a deceit on the investors. And the other smoking gun email, Your Honor, is the cover-up, which is Exhibit 145. I'll point out the page numbers, Your Honor, for the record is A1017. And those are emails April 24, 2008, between Larry Pust and Robert Anderson. And the cover-up is the false excuse to the investors about why interest payments are not coming. Larry Pust asked Bob Anderson, what should we tell investors their interest payments are not coming? Robert Anderson says, give them a false excuse. Tell them we transitioned from paper and pencil to computers, and there's a computer problem in that respect, and they will understand. The real reason for the problem is actually laid out in the first two lines of the email, which is we have no funds left in the escrow account. And this same false computer excuse was testified to many investors who testified at trial, that that was the reason given to them by Larry Pust as to why their funds were not coming. In fact, it's on paper in Exhibit 162. And for the record, that is A1032. And in that email, Larry Pust tells an investor, Mr. Sorsa, who testified at trial, that a computer problem is preventing interest payments from going to him. That is a false excuse directly following the information he got from Robert Anderson. The emails have direct linkages to what the evidence was at trial. In particular, one of your honors noted that there was no discussion about low-income housing by Larry Pust and Robert Anderson out of 7,500 email messages linked to Larry Pust's account. If these two individuals were involved in a $10 million investment in the inner city lots of Chicago to build low-income housing, you would see one email about it, but you don't. And that is indicative of the fact that Larry Pust knew that what they were doing was using the funds for training programs. You would also see Larry Pust and Robert Anderson talking about returns that were coming from alleged low-income housing, the interest they were generating, the closings that were going to happen, the number of apartments that were going to be sold. None of that is in the emails. What you have is pet projects, them talking about training programs, high-grade investment debt, luxury condo development. That is in the emails in the supplemental appendix, and that was also testified to at trial. We had witnesses from these various pet project investment programs come in and testify, and they said that it had nothing to do with low-income housing and everything to do with some degree of high-yield, sophisticated, investment-grade investments. And one of your honors also pointed out, if I may, that this argument that Larry Pust was a victim was presented at trial. Page 1006 of the trial transcript, the argument to the jury was Larry Pust is a victim. He was duped by Robert Anderson, and the jury reasonably rejected that argument by its verdict. Now, viewing the evidence in the light most favorable to the government, the jury could reasonably conclude that Pust had the intent to defraud. Unless you have further questions, I ask you to affirm the judgment below. Thank you. All right, thank you. Anything further, Mr. Morris? I'm sure there is. You have about a minute. Just to touch briefly on some of the specific evidence that Mr. Arjani called out. First off, Exhibit 126, which is A1009, he's criticizing Larry Pust, saying it's proof of intent to defraud because they're talking about both REI and non-REI programs at the same time. I want to remind the Court that in their brief, they criticize Exhibit 119 as proof of intent to defraud because they're not talking about the REI programs at all. As Hirshberg says, evidence which can prove anything proves nothing, and that's true here. Judge Williams asked about Exhibit 153 that starts at A1020 at sequence, and it was some of the edits that went back and forth on a letter to investors. I'd urge the Court to look at the nature of those very minor edits made. It's not as though Larry's creating new excuses to plug into a letter that is then sent out. He's making some style edits to the document. 162 is interesting because if the Court will recall, I actually brought this up in my opening comments. Yes, he relays the excuse he's given by Bob Anderson about computer programs, but then he goes on to say, personally, I think the lenders are slowing down and mentions that that is not necessarily the reason he thinks there's a problem. There's a disclosure there. I thank you for the Court's time. All right. Thank you very much, and you were appointed, were you not? Yes, ma'am. So we thank you very much for your help to your client and to the Court. Thanks as well to the government. We take the case under advisement.